**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 18-40004-01-DDC** |
| **MARK BERG (01),** | |
| **Defendant.** | |

**MEMORANDUM AND ORDER**

On December 9, 2017, Trooper Kyle Seiler of the Kansas Highway Patrol ("KHP") stopped defendant Mark Berg on Interstate 70. After he completed the traffic stop, Trooper Seiler continued the encounter in a consensual manner. Trooper Seiler asked Mr. Berg a series of questions that culminated with him asking for consent to search Mr. Berg's vehicle. When Mr. Berg declined, Trooper Seiler detained him and requested a drug detection canine to come to the scene. After the canine indicated that Mr. Berg's vehicle contained a controlled substance, Trooper Seiler searched the vehicle. He discovered 471 pounds of marijuana in it.

Now, Mr. Berg asks the court to suppress all evidence and any statements he made after Trooper Seiler detained him for the dog sniff because, he says, Trooper Seiler lacked reasonable suspicion to detain him. For reasons explained by this Order, the court denies Mr. Berg's Motion to Suppress (Doc. 15).

## I.    Background

The following facts are taken from the evidence presented at the July 11, 2018 motion hearing.

## A.     Vehicle Behavior

Around 10:30 p.m. on Saturday, December 9, 2017, Trooper Seiler was stationed in the median near milepost 225 on Interstate 70 in Ellsworth County, Kansas.  He was monitoring traffic traveling on the eastbound-half of the interstate.  While stationed there, Trooper Seiler noticed three vehicles traveling in close succession to one another.  The vehicles were traveling in this order:  a light-colored pickup truck; a red minivan; and a dark-colored compact car.  He noted the three vehicles were following each other closely, all at about the same speed in the right, or travel lane.  The vehicles' proximity to one another and their speed—they were traveling at about 65 mph in a 75-mph zone—caught Trooper Seiler's attention.  That combination of facts led him to suspect the three vehicles might be traveling together.  He decided to investigate further and pulled out onto the highway.

About one-half to three-quarters of a mile from Trooper Seiler's original position, he caught the last of the three vehicles—the compact car.  At this point, the pickup and the minivan had moved farther ahead of the compact car.  Trooper Seiler began pacing the compact car to check its speed while simultaneously checking the compact car's registration.  The car was registered in California to a rental car company.  And it still was traveling about 65 mph.  Trooper Seiler did not see the compact car commit any traffic infractions so he decided to break off contact and catch the minivan.

When Trooper Seiler caught the minivan, he began to pace it.  While doing so, he began running its registration.  He learned that it was registered in Arizona to a rental car company.  Trooper Seiler also noted that the minivan was following the pickup closely—less than 100 feet separated the two—and he intended to time their separation.  Before he could do so, he watched the minivan leave the roadway to the right.  Both right tires completely crossed the right fog line

2

onto the rumble strips for about two or three seconds. Trooper Seiler heard the tires on the rumble strips and could see pavement between the van's right tires and the white fog line. At this point, Trooper Seiler activated his dash-mounted camera.[1]

When the minivan left the roadway, the pickup began to accelerate away from the minivan. Trooper Seiler began to follow the pickup as it accelerated, and he clocked its speed at 85 mph. The pickup stopped accelerating and maintained a speed around 84 mph. Trooper Seiler checked the pickup's registration and learned that it was registered in California to a private individual.

Based on his training and experience and the way the three vehicles behaved, Trooper Seiler now believed that the pickup, minivan, and compact car were traveling together. Specifically, based on their actions, Trooper Seiler believed the pickup and compact car were serving as escort vehicles and that their drivers were trying to draw his attention away from the minivan. Trooper Seiler, based on his observations to date, believed the van was the load or courier vehicle. So Trooper Seiler slowed until the minivan caught his patrol vehicle. He pulled behind the minivan and initiated a traffic stop of it.

### B.    Traffic Stop

When he approached the minivan, Trooper Seiler noticed the minivan was packed with cardboard boxes and large black bags. Trooper Seiler learned the van's driver was Mark Berg—the defendant in this case. Trooper Seiler asked Mr. Berg if he had his license with him. While Mr. Berg searched for his license, Trooper Seiler asked him if he was moving, and Mr. Berg replied he was. Trooper Seiler then asked where he was headed, and Mr. Berg replied he was

---

[1]    When a KHP trooper activates his dash-mounted camera, the recording system preserves the last two minutes of video before the camera was activated. But it captures no audio for those two minutes. Accordingly, Government's Exhibit 1—the video recording taken from Trooper Seiler's dash camera—starts as he catches the compact car. But the audio starts as the minivan leaves the roadway.

headed home to Coon Rapids, Minnesota. Trooper Seiler then asked him where he was coming from, and after a pause, Mr. Berg replied, "Uh . . . Las Vegas." Gov. Ex. 1 at 5:52–55. Eventually, Mr. Berg produced a Minnesota driver's license that Trooper Seiler later confirmed was valid.

When Trooper Seiler was telling Mr. Berg that his vehicle had left the roadway onto the rumble strips and re-entered the roadway, Mr. Berg interrupted him and said, "Yea, I was trying to set my cruise control." *Id.* at 5:57–6:05. Trooper Seiler asked for the rental agreement and noticed the minivan was rented in Las Vegas on December 6, 2017, and due back to the rental car company the next day, December 10, 2017. After inspecting Mr. Berg's documents, Trooper Seiler said that he was not going to write a ticket. Instead, Trooper Seiler asked Mr. Berg to come back with him and sit in the patrol car. Mr. Berg obliged.

As Mr. Berg exited the minivan, Trooper Seiler looked into the back of the minivan a second time. Trooper Seiler then told Mr. Berg that he needed to pat him down for officer-safety reasons. Mr. Berg responded that he always had respect for law enforcement and complied.

Once they got into the patrol car, Trooper Seiler questioned Mr. Berg about his travel plans while the trooper prepared the warning ticket on his computer. From his questions, Trooper Seiler learned Mr. Berg did not work in Las Vegas and he was there "just packing up some stuff." *Id.* at 7:27. Trooper Seiler asked Mr. Berg if he lived in Las Vegas. At first, he replied no, but then corrected himself and said he had lived there a couple months. When Mr. Berg was asked specifically what he had packed, he replied, "Just the stuff I had at the house." *Id.* at 8:02. Trooper Seiler then asked about any furniture he may have and Mr. Berg explained, "Just a bunch of clothes, a TV, s*** like that." *Id.* at 8:11. Mr. Berg later explained he only had lived in Las Vegas for about two months and that "gambling" had taken him there.

During this interaction, Trooper Seiler ran Mr. Berg's name for warrants and prior drug arrests. Dispatch informed the trooper that Mr. Berg's record included neither. Through further questioning, Trooper Seiler learned Mr. Berg's past and future travel plans. Mr. Berg said he'd left Las Vegas on December 7, 2017, had stopped at hotels and rest areas, and now planned to drive straight through to arrive home by 5:00 a.m. or so the following morning. Mr. Berg specifically mentioned he had stayed in Denver the night before, December 8, 2017. He also said he needed to be home for work on Monday morning, December 11, 2017.

### C.     Consensual Encounter

About eight minutes into the traffic stop, Trooper Seiler gave Mr. Berg the warning ticket and told him to pay more attention to the roadway. As Mr. Berg started to leave the vehicle, Trooper Seiler asked, "Can I ask you a couple more questions?" *Id.* at 12:44. Mr. Berg sat back down and jokingly asked whether he could get "an escort all the way back to Minnesota?" *Id.* at 12:46.

Trooper Seiler asked if Mr. Berg knew that I-70 was a "pretty major drug-trafficking corridor?" *Id.* at 12:57–13:00. Mr. Berg responded that he had never been on I-70 before. Trooper Seiler then asked if Mr. Berg had anything illegal in his car—specifying methamphetamine, cocaine, heroin, large amounts of U.S. currency, guns, or large amounts of marijuana. Mr. Berg shook his head, smiled, chuckled, and answered, "Nope." Then, Trooper Seiler asked Mr. Berg again if he had any large amounts of marijuana. Again, he replied he did not. *Id.* at 13:14–13:30. Trooper Seiler then asked permission to search Mr. Berg's van. Mr. Berg declined, and said, "I thought you were giving me a warning?" *Id.* at 13:30–13:35. Trooper Seiler then asked three more times for permission to search. Each time, Mr. Berg declined. *Id.* at 13:35–14:00.

At that point, Trooper Seiler asked Mr. Berg, "Is there a reason you don't want me to search your car?" *Id.* at 14:05.  Mr. Berg responded, "No.  I'm trying to get back on the road." *Id.* at 14:08.  Trooper Seiler said, "I understand.  But I'm just asking you for consent to search it, so we can get you back on your way." *Id.* at 14:09–14:14.  Mr. Berg said no two more times. Trooper Seiler then gave Mr. Berg a "final opportunity" to consent.  Mr. Berg still said no.  *Id.* at 14:14–14:26.

### D.    Detention for Dog Sniff

Trooper Seiler told Mr. Berg that he was detaining him to see if he could get a drug dog to come out to the location.  Trooper Seiler called his dispatcher and asked, "Can you contact the K-9 for a refusal, please?" *Id.* at 14:40–14:44.  This request was made at 10:40 p.m.  About two minutes later, a second trooper—Master Trooper Steve Sneath—arrived.  Master Trooper Sneath had been stationed in the median with Trooper Seiler before he initiated the stop.

While they waited for the canine, Master Trooper Sneath mentioned that he had seen three California cars together at the rest stop.  Trooper Seiler responded, "They all left." *Id.* at 17:00–17:03.  Master Trooper Sneath then repeated that he had seen the California cars "all at the rest stop together." *Id.* at 17:25–17:30.  Trooper Seiler testified that he understood Master Trooper Sneath to be talking about the same three vehicles he found suspicious.  And he also understood Master Trooper Sneath's statements to indicate that he, too believed, the vehicles were traveling together.

Technical Trooper Rohr and his canine, Nico, arrived on the scene at 11:10 p.m.—40 minutes after the traffic stop had begun and 30 minutes after Trooper Seiler had detained Mr. Berg.  When Trooper Rohr arrived, Trooper Seiler said this was the "moment of truth." *Id.* at 50:20–50:25.  He explained to Master Trooper Sneath that "he"—referring to Mr. Berg—is "not

very nervous.  But he didn't ever—you know—usually when someone doesn't want to take the time, they'll say 'oh you can search it.'  Or 'I don't have anything.'  I mean, nothing.  None of that.  I mean—it's bizarre, whatever it is."  Trooper Seiler then referenced the increased cost of a one-way rental—the arrangement that applied to Mr. Berg's rented minivan.  He said, "None of it is making sense."  *Id.* at 50:25–50:48.

When Trooper Rohr gave Nico the command to sniff, he directed him around the minivan in a counter clockwise direction.  As Trooper Rohr directed Nico around the car and passed the driver's door, he observed an alert.  Nico suddenly changed directions and began to sniff intensely low and high around the driver's door.  The driver's door window was opened; Nico moved up to the window and began to sniff more intensely.  Trooper Rohr called Nico back to him and began to direct Nico a second time.  Nico changed direction suddenly and went back to the driver's door; putting his front paws on the open window, acting like he wanted to jump into the minivan.  Trooper Rohr called Nico to him again and started to direct Nico down low on the car.  Nico turned once more and went back to the driver's door.

Nico did this a total of four times and, each time, he focused on the area between the driver's door and the sliding door.  Trooper Rohr gave Nico the command to sniff near the door seam on the driver's door.  After Trooper Rohr gave this command, Nico sat and stared at the door.  Nico is trained to sit and stare after locating the source of a drug odor.  Trooper Rohr then advised Trooper Seiler that Nico had indicated on the vehicle, and Trooper Seiler could search the vehicle.  A search of Mr. Berg's minivan led law enforcement to find contraband, which it claims consists of 471 pounds of marijuana.

After they discovered the suspected marijuana, the troopers read Mr. Berg the *Miranda*[2] warning. Mr. Berg then gave an incriminating statement to police, explaining that he had been hired to make a one-time delivery of marijuana from California to Minnesota.

Mr. Berg now asks the court to suppress all evidence secured from his detention, law enforcement's search of the vehicle, and any other evidence acquired from his arrest, including his statement to police.

## II.       Fourth Amendment Standard

The Fourth Amendment[3] to our Constitution forbids unreasonable searches and seizures. *California v. Carney*, 471 U.S. 386, 390 (1985). When a defendant challenges the reasonableness of a search or seizure, the government bears the burden to prove by a preponderance of the evidence that the challenged search or seizure was reasonable. *United States v. Matlock*, 415 U.S. 164, 177 (1974); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001). If the court determines that a search or seizure violated the Constitution, the exclusionary rule prohibits admission of the fruits of all evidence seized illegally. *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

## III.      Analysis

Mr. Berg's motion challenges just one issue: Whether Trooper Seiler had reasonable suspicion to detain him for a dog sniff. Nonetheless, the court addresses all the relevant issues in this traffic stop—albeit more briefly than it would had Mr. Berg challenged all aspects of the

---

[2]      *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[3]      "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

stop. The court's analysis focuses on reasonable suspicion. Ultimately, the court concludes that Trooper Seiler possessed reasonable suspicion that Mr. Berg was engaged in drug trafficking.

### A. Traffic Stop

"[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment]." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). A traffic stop can pass Fourth Amendment muster "if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). Reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (internal quotation and citation omitted).

During the July 11, 2018 hearing on defendant's motion, the government argued that Trooper Seiler possessed reasonable suspicion to stop Mr. Berg for drug trafficking beginning when he observed the three vehicles' behavior on I-70. So beginning with that observation the government asserts, Trooper Seiler possessed reasonable suspicion to detain Mr. Berg for a dog sniff. The evidence does not persuade the court that Trooper Seiler's suspicions rose to the requisite level to detain based solely on watching the three cars. But Trooper Seiler did observe Mr. Berg commit two traffic violations and thus the court concludes that those violations validated the traffic stop.

Kansas law prohibits a driver from following another vehicle "more closely than is reasonable and prudent." Kan. Stat. Ann. § 8-1523(a). The Tenth Circuit and Kansas courts have applied the "car-length" and "two-second" rules to determine reasonable and prudent behavior. The "car-length" rule suggests that depending on road and weather conditions, a driver

should maintain one car length—ten to fifteen feet—for every ten miles per hour. *United States v. Vercher*, 358 F.3d 1257, 1261–62 (10th Cir. 2004). In *Vercher*, the Circuit found 100 to 150 feet was a reasonable and prudent distance when traveling at 70 mph. *Id.* Under the "two-second" rule, a driver should maintain a distance of at least two seconds between his car and the car ahead. *United States v. Hunter*, 663 F.3d 1136, 1142–43 (10th Cir. 2011).

Here, Trooper Seiler saw Mr. Berg following the pickup at a distance that Trooper Seiler estimated as less than 100 feet. According to the "car-length" rule and *Vercher*'s reasoning, at a speed around 65 mph, 100 feet likely is the closest distance that is reasonable and prudent. Also, although Trooper Seiler was not able to count the interval between Mr. Berg and the pickup in front of him, the video from the dash camera in Trooper Seiler's vehicle showed an interval of about one second. Based on the "car-length" and "two-second" rules, the court finds that Trooper Seiler had reasonable suspicion to believe Mr. Berg was following the pickup in front of him too closely.

Kansas law also requires drivers to keep their vehicles within a single lane. Specifically, Kan. Stat. Ann. § 8-1522(a) requires a vehicle to be driven "as nearly as practicable entirely within a single lane" and it prohibits a driver from leaving that lane "until the driver has first ascertained that such movement can be made with safety." A driver violates § 8-1522(a) when: (1) he intentionally makes a lane change, and that lane change was unsafe; and (2) it is practicable to maintain a single lane, but he fails to do so. *State v. Marx*, 215 P.3d 601, 611 (Kan. 2009). In *Marx*, a police officer stopped a motorhome after it crossed the fog line, overcorrected, and then crossed the center line. *Id.* at 604. The Kansas Supreme Court held that the officer lacked reasonable suspicion to stop the motorhome because it never violated § 8-1522(a). *Id.* at 613. In reaching this conclusion, *Marx* considered the following factors: (1)

there was only one lane breach; (2) there was no testimony about how far over the line the motorhome had moved; (3) there was no testimony about traffic conditions; and (4) there was no evidence permitting the court to infer anything about the practicability of maintaining a single lane. *Id.*

Here, the evidence is different. It established sufficient reasonable suspicion that Mr. Berg violated § 8-1522(a). Although Mr. Berg's minivan left the lane just once, the vehicle crossed the fog line for about two to three seconds. Trooper Seiler heard Mr. Berg's tires on the rumble strips and could see pavement between the tire and the fog line. This is different from *Marx* where the court lacked evidence about how far over the line the motorhome had moved. Mr. Berg told Trooper Seiler that he had swerved trying to set the cruise control, indicating that the movement was unintentional—and not a movement to avoid a hazard. Also, unlike *Marx*, the dash camera video shows no obstacles or hazards that would have made it impracticable for Mr. Berg to maintain his lane. So the court can infer it was practical for Mr. Berg to maintain his lane. But for two to three seconds, his van left its lane and traveled with his right tires on the shoulder. Accordingly, Trooper Seiler had reasonable suspicion to believe Mr. Berg had violated Kan. Stat. Ann. § 8-1522(a).

In sum, Trooper Seiler had reasonable suspicion to believe Mr. Berg had committed two traffic violations: violating §§ 8-1523(a) (following too closely) and 8-1522(a) (failing to maintain a lane). The traffic stop was valid.

### B.   Trooper Seiler's Actions During the Initial Stop

Trooper Seiler's actions during the initial stages of the traffic stop were appropriately limited to the mission of the stop. The Supreme Court has held:

> A seizure for a traffic violation justifies a police investigation of that violation. A relatively brief encounter, a routine traffic stop is more analogous to a so-called

> *Terry* stop than to a formal arrest. Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose.

*Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal quotations, citations, and corrections omitted). The Supreme Court has explained the permissible mission of a traffic stop: "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615 (internal quotation, citations, and corrections omitted). The Tenth Circuit also has allowed an officer to "generally inquire about the driver's travel plans and ask questions, whether or not related to the purpose of the stop, so long as they do not prolong the stop." *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (citations omitted).

Here, Trooper Seiler checked Mr. Berg's name for warrants and prior arrests and questioned him about his travel plans while he completed the warning. So Trooper Seiler properly confined his actions to the traffic stop's mission.

## C.     Consensual Encounter

After Trooper Seiler completed the stop, his interaction with Mr. Berg continued in a consensual encounter. "Once an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." *United States v. Villa*, 589 F.3d 1334, 1339 (10th Cir. 2009). But, "[a]dditional questioning unrelated to the traffic stop is permissible if the detention becomes a consensual encounter. Whether the driver has consented to additional questions and detention turns on whether a

reasonable person would believe he was free to leave or disregard the officer's request for information." *Id.* at 1339–40 (internal quotations and citations omitted).

The court thus must decide if the encounter between Trooper Seiler and Mr. Berg became a consensual one or, alternatively, if Trooper Seiler had reasonable suspicion to prolong the detention. *See United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998) ("Lengthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances. First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." (citations omitted)).

Mr. Berg does not challenge that he consented to the questions after Trooper Seiler told him he was free to leave. *See United States v. Ledesma*, 447 F.3d 1307, 1315 (10th Cir. 2006) ("[A trooper's] words of farewell suggest[ ] that any subsequent discussion was consensual."). Trooper Seiler asked Mr. Berg whether he had contraband in the minivan. Mr. Berg responded. And then, Trooper Seiler asked Mr. Berg for consent to search his van. While it is well-settled that law enforcement may search without a warrant when consent is given, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973), that consent must be voluntary, *United States v. Dewitt*, 946 F.2d 1497, 1500 (10th Cir. 1991). So the government must "prove consent was given without duress or coercion, express or implied." *Id.* (internal quotation marks and citation omitted).

The court addresses consent here because, although Mr. Berg never consented, the court has substantial reservations about the way Trooper Seiler solicited his consent. Specifically, Trooper Seiler asked Mr. Berg for consent to search his vehicle seven different times. This

bordered on badgering.  And with his multiple requests, Trooper Seiler included two phrases of particular concern.  After Mr. Berg refused several times, Trooper Seiler said that he wanted "consent to search so [he] could get [Mr. Berg] back on his way."  Gov. Ex. 1 at 14:09–14:14. Then, when Mr. Berg continued to refuse consent, Trooper Seiler gave him a "final opportunity" to consent.  *Id.* at 14:14–14:26.

Trooper Seiler tried to explain his multiple requests for consent at the July 11, 2018 hearing.  He testified that even if Mr. Berg had given his consent in response to any of Trooper Seiler's requests after had had declined the first request, Trooper Seiler would not have relied on that response as putative consent.  This concession says it all.  Repeated requests for consent are unlikely to produce genuine consent.  It concerns the court when law enforcement persists as Trooper Seiler did here.

But in the end, the court's reservations do not matter to the conclusion here because Trooper Seiler proceeded in another fashion.  After Mr. Berg refused, Trooper Seiler explained that he was detaining Mr. Berg until a drug detection canine arrived.  Trooper Seiler asserts that he had reasonable suspicion to extend the detention.  Naturally, Mr. Berg disagrees.

### D.  Reasonable Suspicion to Detain

"[A] dog sniff is not fairly characterized as part of the officer's traffic mission"—rather it is "aimed at detecting evidence of ordinary wrongdoing"—so the officer must reasonably suspect criminal wrongdoing to detain the defendant while the drug detection canine arrives and is deployed.  *Rodriguez v. United States*, —U.S.—, 135 S. Ct. 1609, 1615 (2015) (internal quotation marks, corrections, and citations omitted).  When determining whether an officer had acquired reasonable suspicion of other criminal activity during a traffic stop, the court considers the totality of the circumstances.  *United States v. White*, 584 F.3d 935, 950 (10th Cir. 2009).  "A

factor may raise objectively reasonable suspicions even if it is not by itself proof of any illegal conduct and is quite consistent with innocent travel." *Id.* (quoting *United States v. Valles*, 292 F.3d 678, 680 (10th Cir. 2002) (internal quotation marks omitted). "But unparticularized hunches based on indicators so innocent or susceptible to varying interpretations as to be innocuous cannot justify a prolonged traffic stop or vehicle search." *Id.* (quoting *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997) (internal quotation marks omitted)).

The government contends that Trooper Seiler had reasonable suspicion based on seven articulable facts:

1. The three vehicles exhibited behavior consistent with drug trafficking;

2. Mr. Berg's cargo was unusual because it consisted of luggage and same-sized boxes that did not appear consistent with the things Mr. Berg said he had packed in Las Vegas to move—a TV and some clothing;

3. Mr. Berg was traveling in a rental car;

4. Mr. Berg had trouble expressing whether he lived in Las Vegas and what his business there was;

5. Mr. Berg's breathing was shallow and quick throughout the whole encounter;

6. Mr. Berg took an indirect route of travel; and

7. Mr. Berg said he was in a rush to get home, but his statements about his travel timeline, rental agreement, and travel route made that implausible.

While the court concludes that Trooper Seiler possessed reasonable suspicion to detain Mr. Berg, the court finds several facts identified by the government are innocuous and, at least here, not persuasive. Specifically, the court finds that the credible evidence supports the first two facts

and, together, they provided reasonable suspicion. But the others are "so innocent or susceptible to varying interpretations as to be innocuous." *See id.*

*First*, Trooper Seiler explained at length why he believed the pickup, the minivan, and the compact car were traveling together. Although his suspicions did not rise to the requisite level to justify a traffic stop, he provided articulable reasons for suspecting these vehicles were traveling together. So ultimately, this fact contributed to the totality of the circumstances supporting Trooper Seiler's assessment of reasonable suspicion.

Trooper Seiler testified that he had attended two conferences in 2017 on criminal interdiction where he received specialized training in drug trafficking detection. Specifically, he learned how to identify vehicles operating together as part of a drug trafficking scheme. This training acquainted him with techniques where traffickers use escort vehicles to monitor a load's progress and, if necessary, to distract law enforcement officers from the load vehicle. Applying his training to his observations that night, Trooper Seiler identified the pickup and compact as escort vehicles for the load vehicle—the minivan.

Trooper Seiler explained that it was uncommon to see three cars with out-of-state plates in such close proximity to one another on I-70. So he decided to investigate. During this investigation, he formed suspicions based in reason, experience, and fact. First, when he pulled out of his position to catch up to the compact car, he noticed the pickup and minivan had increased their distance from the compact car. Trooper Seiler explained that he did not know whether the pickup and minivan had accelerated or the compact car had decelerated, but he perceived the increased distance as a deliberate tactic utilized to draw his attention away from the minivan. Importantly, the compact car was traveling 10 mph below the posted speed limit. After checking registration and speed on the car, Trooper Seiler moved on to the minivan.

Trooper Seiler noticed the minivan was following the pickup too closely and then saw the minivan leave the roadway. Trooper Seiler testified—and video from his dash camera verifies—that almost immediately after the minivan veered off the road, the pickup accelerated to about 10 mph over the speed limit. Trooper Seiler perceived this acceleration as another purposeful tactic designed to draw his attention away from the minivan. So, after he checked the pickup's speed and registration, he stopped the minivan.

Trooper Seiler was able to articulate other reasons he believed the minivan was the courier and the other vehicles were escorts. He eliminated the pickup as the courier because, he explained, vehicles owned by private individuals are not usually used as courier vehicles. Also, he said the pickup did not have the capacity to hold a large load. He eliminated the compact car because of its limited capacity as well. In short, Trooper Seiler's articulated reasons support reasonable suspicion for his belief that the three vehicles were operating in concert and why this was unusual.

*Second*, Trooper Seiler testified in detail about his observations of the cargo in the minivan. The court recognizes that Trooper Seiler regularly encounters individuals who are moving and so, the court finds his observations on this subject credible. Trooper Seiler testified that the rear cargo area was packed with boxes and suitcases. Although this is not unusual for someone who is moving, Trooper Seiler saw several unusual things. He noted that the boxes were all the same shape and size. And there were several large black bags of similar make and construction. In short, there was no variety among the boxes and bags, as Trooper Seiler normally sees when a driver is using a passenger vehicle to move. Trooper Seiler also found it suspicious that the minivan was the type that has three rows of seats. But he could not observe the seats (as if they had been removed). Finally, and quite importantly, Trooper Seiler noted that

there were no personal belongings visible. He testified that, in his experience, when someone uses a passenger vehicle to move, he typically sees pillows, blankets, and other items not packed in boxes. He saw none of that here.

The three vehicles' behavior already had caused Trooper Seiler to form suspicions, but the unusual nature of the cargo increased his level of suspicion. He usually sees passenger vehicles with only a few household items or with a lot of items "crammed in." But here, he saw a van carefully and neatly packed. The minivan was packed so that no space was wasted and he couldn't see the back seats. Finally, he couldn't see any household items—everything was concealed. Independently, a neatly packed vehicle would not reasonably support suspicions. But when viewed in the totality of the circumstances, this unusual occurrence provided another articulable reason for suspicion. In sum, the combination of the vehicles' behavior and the unusual nature of the minivan's cargo provided Trooper Seiler reasonable suspicion to detain Mr. Berg long enough for a drug detection canine to arrive.

The government's remaining facts do not contribute anything to the reasonable suspicion analysis. The government tries to rely on Mr. Berg traveling in a rental car. The Tenth Circuit has viewed rental cars differently. *Compare United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011) ("Finally, our cases note drug traffickers often use rental vehicles to transport narcotics.") *with United States v. Karam*, 496 F.3d 1157, 1165 (10th Cir. 2007) ("[A] one-way flight in one direction and a one-way rental vehicle in the other direction is not the type of unusual itinerary that gives rise to reasonable suspicion."). In this circumstance, Mr. Berg's rental car coincided with his explanation that he was moving. So a rental vehicle does not support reasonable suspicion.

The government also relies on perceived inconsistencies in Mr. Berg's statements about living and working in Las Vegas. But nothing in the facts suggest Mr. Berg was inconsistent. Indeed, at one point, Trooper Seiler said Mr. Berg was traveling from Los Angeles and Mr. Berg corrected him, interjecting, "Las Vegas." Likewise, Mr. Berg consistently reiterated that he was traveling home—to Minnesota—after spending a couple of months in Las Vegas to gamble.

Next, the government says, Mr. Berg's breathing was shallow and quick, suggesting he was extremely nervous throughout the encounter. But this directly contradicts Trooper Seiler's comment to Master Trooper Sneath that Mr. Berg did not seem nervous. Trooper Seiler also contradicted this fact during the July 11, 2018 hearing, saying that Mr. Berg's voice wavered, but no more than usual for a traffic stop.

Finally, the government tries to use Mr. Berg's travel plans for support. The government conducts an in-depth analysis of distance and time between Las Vegas and Coon Rapids, Minnesota. The government questions Mr. Berg's route and the amount of time he spent in Colorado. In short, the government does not agree with Mr. Berg's explanation of his travel plans.

The Tenth Circuit "ha[s] generally been reluctant to give weight in the reasonable-suspicion analysis to unusual travel purposes, at least absent lies, inconsistencies, or the like." *United States v. Lopez*, 849 F.3d 921, 927 (10th Cir. 2017). The government has not directed the court to any lies or inconsistencies in Mr. Berg's explanation. Simply put, the government suggests only that Mr. Berg was traveling on a route that added a bit of time to his travel and that he stayed in Denver for part of a day. Spending a few extra hours in a city along the route and then driving straight to the destination are not the type of unusual or inconsistent travel plans that

support reasonable suspicion.  *See id.*; *see also United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997).

In sum, these facts have varying interpretations and thus lend no support to the court's reasonable suspicion finding.  But though it is a close call, the vehicles' unusual behavior, the unusual content of the minivan's cargo, and the odd way it was packed provided Trooper Seiler reasonable suspicion to detain Mr. Berg for a dog sniff.

### E.    Probable Cause for Car Search

After a 30-minute period, a drug detection canine with the KHP arrived on scene and indicated that the minivan contained contraband.  Based on this trained canine's alert, Trooper Seiler searched Mr. Berg's minivan and found evidence of marijuana.  Mr. Berg does not challenge whether the canine's alert and subsequent indication provided Trooper Seiler probable cause to search the minivan, so the court addresses the issue only briefly.

As a preliminary matter, law enforcement generally must have a warrant to search a person or his house, papers, or effects.  U.S. Const. amend. IV.  But there are exceptions to this rule, and the "vehicle exception" is one of them.  Under this exception, law enforcement may search an automobile during a traffic stop without a warrant "if probable cause exists to believe that contraband or evidence of criminal activity is located inside."  *United States v. Baylor*, No. 06-40099-01-RDR, 2006 WL 3146348, at *2 (D. Kan. Oct. 31, 2006) (first citing *Chambers v. Maroney*, 399 U.S. 42 (1970); *then citing Carroll v. United States*, 267 U.S. 132 (1925)).

A drug detection canine can provide the requisite probable cause if it indicates contraband is located in the car.  *See Florida v. Harris*, 568 U.S. 237, 246–47 (2013) ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable

cause to search."). Here, Nico was a trained and certified drug dog. He alerted to Mr. Berg's minivan and then indicated at a specific point along the van. This indication provided probable cause to search the vehicle. And so, the vehicle search was valid.

In sum, Trooper Seiler possessed reasonable suspicion to stop Mr. Berg for following too closely and failing to maintain his lane. From there, Trooper Seiler's actions were appropriately limited to the mission of the stop. Once the stop was complete, Trooper Seiler and Mr. Berg continued with a consensual encounter. During this encounter, Mr. Berg refused consent to search his minivan and then, Trooper Seiler detained him. Facts learned by Trooper Seiler before and during the traffic stop provided him reasonable suspicion to believe that Mr. Berg was engaging in criminal activity. This permitted him to detain Mr. Berg while the drug detection canine arrived. Once the canine arrived, he alerted on the minivan, providing probable cause to search it for contraband. Accordingly, the court denies Mr. Berg's Motion to Suppress (Doc. 15).

## IV. Objection to TFO Shawn Herrman's Testimony

At the July 11, 2018 motion hearing, during the direct examination of Task Force Officer ("TFO") Shawn Herrman, Mr. Berg's defense counsel objected to a question by the prosecutor. This question was: "Based on your training and experience and your review of the facts in this case, do you have an opinion as to whether or not Mr. Berg was engaged in drug trafficking with the assistance of escort vehicles?" Doc. 20 (July 11, 2018 Hr'g Tr.) at 10. The court allowed the parties seven days to file briefs about the validity of the objection. They have done so.

The government filed a comprehensive brief arguing why the court should overrule the objection under Fed. R. Civ. P. 403, 608, and 702. *See* Doc. 21. In his brief, Mr. Berg withdrew

his objection. Doc. 22 at 2. Mr. Berg conceded that the testimony likely was admissible because defense counsel failed to object under Rules 403 or 702. *Id.*

In light of Mr. Berg's decision to withdraw his objection, the court overrules the objection and finds that it could—and did—consider the following question and response:

> [Prosecutor:] What I'm asking you, Agent Herrman, is whether or not based on your review of the evidence in this case, in your training and experience, what is your opinion as to whether or not Mr. Berg was couriering drugs with the assistance of an escort vehicle.

> [TFO Herrman:] He was. Doc. 20 at 13.

But this testimony, though admitted, adds little to the government's case. It substantiates Trooper Seiler's testimony that drug traffickers sometimes use escort vehicles to avert attention from a load vehicle. But it does nothing else.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Mark Berg's Motion to Suppress (Doc. 15) is denied.

**IT IS FURTHER ORDERED THAT** defendant Mark Berg's objection during the July 11, 2018 hearing is overruled.

**IT IS SO ORDERED.**

**Dated this 1st day of August, 2018, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
